KERMIT A. PARRISH, RESPONDENT, v. FRANK HERRON, JAMES P. LEIGH, CLYDE B. EVERSALE, AND THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, A CORPORATION, APPELLANTS.—225 S. W. 2d 39.

Kansas City Court of Appeals. Opinion delivered December 5, 1949.

W. E. *Stewart,* David W. *Wilson* and *Waldo Edwards* for appellants.

*Paul D. Hess, Jr.,* and *G. R. Breidenstein* for respondent.

BROADDUS, J.—This is an action for damages for false arrest and imprisonment brought by respondent (plaintiff) against Frank Herron, James P. Leigh, Clyde B. Eversole, The Fidelity and Casualty Company of New York, Arlie Rector and Verne C. Goodwin, in the Circuit Court of Knox County. Change of venue was had to the Circuit Court of Macon County, where the cause was tried before a jury. During the course of the trial, plaintiff dismissed as to the last two named defendants, and a verdict for $3,000 went against the remaining four defendants.

The petition alleges, among other things, that defendants Herron, Goodwin and Leigh did arrest plaintiff, and did, by force compel plaintiff to go with them to the jail of Knox County and there by force and violence placed plaintiff in jail and did then and there imprison plaintiff and detain him restrained of his liberty for the space of two days, and without right, or authority so to do, and against the will of plaintiff. It further alleges that defendant Eversole was the sheriff of Knox County and that defendant Leigh was his deputy; that defendant Fidelity and Casualty Company was bondsman for Sheriff Eversole to the amount of $5500.

In view of the fact that defendants urge that plaintiff made no case for the jury we deem it necessary to set forth the evidence somewhat in detail.

Plaintiff testified as follows: He had lived in the vicinity of Knox City all his life, Knox City being in Knox County about nine miles east of Edina the county seat. At the time of his arrest and imprisonment plaintiff who had been a farmer all his life was living on a farm owned by him, and having chickens, milk cows and other livestock on his farm. Plaintiff was married and had a son two months old. His wife was not well and plaintiff had to help with the care of the baby because his wife was bedfast part of the time. Between 7:30 and 8:00 o'clock in the evening of May 31, 1946, defendants Herron, a State Highway patrolman, and Leigh, the deputy sheriff, came to his home. They passed his house going east five or ten minutes before, and then came back. When they came to his place he went out and asked them what was wrong and they told him Arlie Rector had some wire, shoats and posts and a lot of things taken and they wanted to look at plaintiff's pick-up truck standing near, to which plaintiff said, "there it is, you can help yourself." They looked at the truck and elsewhere about the premises, and at his fences using their flashlight. They went in the house at his invitation and there told him they wanted him to go to Edina with them. Plaintiff asked if they had a warrant for him to which Herron said, "No, we don't have. We don't have to have." Plaintiff was dirty from working in his field but he was given permission to go upstairs and take a bath preparatory to going with them. Shortly thereafter Winnie and Jennie Florea, uncle and aunt, and also neighbors of plaintiff came

to his house. Plaintiff begged Herron and Leigh to tell him what they wanted him for, but they just said they had tracked him in. Plaintiff further pleaded with them not to take him and told them he had not done anything, asked them to inquire in the community about his character but instead they took him in the motor car to the sheriff's office in Edina. There they finger-printed him and tried to get him to confess to taking the things, to which he replied: "I can't confess. I have nothing to confess." Defendants Leigh and Goodwin, city marshal of Edina, took plaintiff from the sheriff's office to the jail. As they got to the door of the jail he begged them to let him go over to a hotel and stay all night and he would be back in the morning and, being refused this request, asked them to go get the patrolman; one of them went for Herron and one stayed with plaintiff. Herron came and plaintiff begged him to let him (plaintiff) stay all night at a hotel and that he would be back in the morning, but Herron told him that was clear out of the question and pushed plaintiff into jail, after which they locked the door. The jail was dirty, no covers, no pillows, only mattresses on the beds. Plaintiff put papers over the mattress before lying down because he figured there would be bugs in it. The next morning it looked as if it would rain and plaintiff called out of the jail window to some people passing by whom he knew and told them to have some of his neighbors go out before it rained and look at the tracks in the road where he had turned around; that plaintiff had a pasture rented about a mile and a half away from his home and had a part of his cows up there and had gone up there in the afternoon of May 30, 1946 in his pick-up truck to look after them and he had turned around in the road; that the place where he turned around was about three miles from the Rector place and he did not pass Rector's house in going to the pasture where he had his cattle. About four o'clock on Saturday afternoon, June 1, 1946, they took him out of jail and to the office of the prosecuting attorney where they tried to get him to confess. He told them he was innocent and did not know anything to tell them. Besides the prosecuting attorney there was another patrolman by the name of Snyder present, and also Herron and Leigh. Sheriff Eversole was not present at any time. After about an hour they released plaintiff and no charge was ever brought against him.

Plaintiff further testified as to his humiliation among his friends and acquaintances, the discussions and rumors going the rounds where he was known, articles in the newspaper about his arrest and imprisonment, his concern for his family while in jail and his subsequent anxiety and mental distress. These are not more fully set forth as no point in that regard is directly raised by this appeal.

On cross-examination plaintiff repeated much of the testimony given in his direct examination. He testified more fully of the search made of his premises, about defendants Herron and Leigh

being in his barn looking at some tools, his hogs, and his chickens. They looked at a fence where he had fence posts up with one string of barbed wire on the posts. This wire was charged with electricity and had been up all spring.

Plaintiff testified that they told him they had tracked him from Arlie Rector's where the wire was stolen to where his car was parked; that he told them he had not been up toward Rector's; that he had been up to take care of his cows which were away from home. Plaintiff testified that the road to where his cattle were lead on up to Rector's place but that his tracks ended where he kept his cows and if there were any tracks beyond that they were not made by his truck; that he turned around where his cows were. The road was narrow and plaintiff backed the truck back and forth several times in turning around. On re-direct examination plaintiff testified that he knew Leigh was a deputy sheriff; that Leigh had a leather strap and a gun on his side; that Leigh was with Herron everywhere they were except Leigh stayed with plaintiff while Herron climbed up into the hayloft; that Leigh was there when plaintiff was put in jail and that it was his best recollection that Leigh had the keys.

On behalf of plaintiff Jennie Florea testified that she is an aunt of plaintiff living about a quarter of a mile away; that she has always lived in the neighborhood; that the patrolman and deputy sheriff were at her place before going to plaintiff's place; that the patrolman came to her door and inquired if she knew a Parrish that had a pick-up truck. He did not know his first name. The witness directed him to where Kermit Parrish lived; that later she and her husband went to plaintiff's house and were present when the deputy sheriff and the patrolman took him away.

Elmer H. Duama, who lives near Knox City, testified on behalf of plaintiff in regard to the publicity given his arrest and imprisonment. Asked concerning plaintiff's reputation he replied: "It's good. There aint no better."

Wilmer L. Cottey, who lives near Knox City, testified on behalf of plaintiff in regard to the publicity given the incident of the arrest and imprisonment and further said he knew plaintiff wasn't that kind of a fellow; that no one who knew him personally believed he was implicated.

Lawrence Goodson, who lives in plaintiff's community, testifying in his behalf, stated that at the request of plaintiff's wife he went to the place where plaintiff had turned around in the road and saw the tire marks made by practically new 6-16 tires and where it looked like he backed up a couple of times to turn around; his recollection was that two Pennsylvania and two Goodrich tires size 6-16 were on plaintiff's truck; that there was a truck of some kind that had tires like that that made a turn-around there at the pasture; that he also heard the discussion and read a piece in a newspaper about the arrest and imprisonment.

Neil Sawyer testified that he accompanied Goodson to view the tracks and generally corroborated Goodson in his testimony.

Fred Ewalt, testifying for plaintiff, stated that he lives close to the cow pasture; that he went out Saturday morning June 1 and saw where a vehicle had turned around and came back down the hill. On cross-examination this witness said: "A set of car tracks were driven up to this particular little pasture and I could see where somebody got out of his car and went over in the pasture. I couldn't say who it was. And they came back and the car turned around and went back south." When asked if it was a car or a truck he replied that it was a vehicle with rubber tires. On re-direct examination this witness testified: "It didn't seem possible to me that he could be implicated."

Christina Parrish, wife of plaintiff, testified in his behalf and generally corroborated him on the circumstances of the arrest.

For the defendants, Arlie Rector testified that he owned two farms about ten miles north of Knox City; that on the morning of May 30, 1946, he found certain wire and other articles missing and noticed the tracks of some vehicle in his barnlot; that the vehicle had been backed up to the door of his shed, where most of the property had been kept; that he noticed that the tracks were not of any vehicle that belonged to him or that had been on his place; that six rolls of woven wire and seven spools of barbed wire were missing; that they were worth about $350; that, also, were missing two post hole diggers, a wire stretcher, a scythe and cycle and a bucket of staples; that he had last seen those articles on May 28; that the tracks were evidently made by new tires of a design similar to that of U. S. Royals; that he followed the tracks south about a mile and a half to where they turned in a northwesterly direction into a lane; that he went back and called the sheriff and showed the tracks to the sheriff just before dark on May 30; that the tracks led to a place which he afterwards learned was owned by the plaintiff, but he did not know plaintiff at that time.

Rector further testified that about 1:00 P. M. on May 31, defendant Herron went to the farm with him and he showed the officer the tracks. On cross-examination of this witness, it developed that a man named Arment, a nephew of witness' wife, later confessed to have taken the seven rolls of the barbed wire, four rolls of the other wire and two of the post hole diggers, the wire stretcher and the bucket of staples. These articles were found where Arment said they had been left. The witness testified that he followed the tracks about four and one-half miles from his place; that he did not see any place where these tracks had backed around.

Defendant, Eversole, Sheriff of Knox County, testified that he was called to the home of Arlie Rector on May 30, 1946, at about dark; that Rector reported the theft of the wire and other articles;

that he saw the tracks from the barn down to the road, but it was too dark to follow them further at that time; that the next morning he called the Macon Patrol and requested them to make an investigation, but made no further investigation himself; that he did not know of the arrest until just before plaintiff was released and did not know that plaintiff was arrested until about noon·of June 1.

Defendant Herron testified that on May 31, 1946, he was advised by the patrol office at Macon to contact Mr. Rector with reference to a theft and that he went with Mr. Rector to his farm; that Rector advised him of the articles that had been stolen; that he followed the tracks leading from the Rector barn yard, which were very plain and evidently made by new tires and were easy to follow, along the main road for a mile and a half or two miles to a bridge over a creek, where the vehicle had turned around and proceeded north and west for about a half mile, where the tracks followed a little-used lane, which contained no other tire tracks. He then followed the track along that lane to where they crossed the main highway again about an eighth mile from where plaintiff lived and followed them to a farm home which he ascertained belonged to plaintiff; that he noticed one place where the tracks had turned and that was where they crossed the main road from this lane; otherwise it did not appear that the vehicle had ever been stopped. At that time it was late in the evening and he had to go back to Macon for a troop meeting.

Patrolman Herron further testified that the next day he contacted Deputy Sheriff Leigh and the two of them went to the vicinity where he had followed the car tracks and went to plaintiff's home about dusk; that the witness asked plaintiff his name and if the truck sitting in the driveway was plaintiff's truck, to which plaintiff replied in the affirmative. The witness then asked plaintiff if he had had occasion to drive his truck west of his house and back up this lane, to which plaintiff replied that he had not been up that lane for quite a while and he was quite sure nobody else had driven his truck up the lane. Later on that evening plaintiff said that his truck had been up the lane a short distance to where he had a rented pasture and that he had gone up there for the purpose of salting his cattle. Plaintiff then asked the witness what they were there for and the witness told him that there had been a burglary of a farm north of his home and that he (the witness) was there for the purpose of making an investigation. The witness had not stated that it was the Rector farm but plaintiff asked if the burglary had been at the Rector farm. Plaintiff then stated that the officers had no right on his place without a warrant, to which the witness replied that he had no warrant but had information that a felony had been committed and he did not need a warrant to carry on his investigation.

The witness noticed that posts had been set for a fence in plaintiff's barn yard but no fence had been erected. He asked plain-

tiff if he was going to fence his barn lot and plaintiff said: "Yes, I haven't any wire at the present time." Plaintiff first objected to their examining the truck but later consented. The witness had been particularly schooled in observing tire marks. The tracks followed were very similar to those of U. S. Royal tires. "There was a notch in either the front or rear tire that made them different but it was—it was very obvious after you observed the tire marks and then saw the tires on the truck that they were similar."

After searching the barns and out-buildings and finding none of the stolen goods, the witness advised plaintiff that he was placed under arrest "to be held until our investigation could be carried on further." The witness waited for plaintiff to clean up and for his wife to get things together, about an hour, and plaintiff took his family to his father's house and then went with the witness and Leigh to Edina, where he was finger-printed and placed in jail.

The next day the witness went with Trooper Snyder and followed the tire tracks again and also went to the pasture rented by plaintiff to search for the missing property but found nothing. They then went back to Edina, where plaintiff was questioned and released.

On cross-examination Herron stated that he stopped at the Florea house before going to arrest plaintiff and asked where plaintiff lived; that he could not remember at the time just what the reason for asking was as he knew where plaintiff lived; that he had found out in Edina that plaintiff lived at the home to which he had tracked the truck. The witness stated that he did not make an investigation of plaintiff's reputation in the community before making the arrest; that he didn't arrest plaintiff because he was afraid of plaintiff escaping, but made the arrest so as to recover the property if they could find it: that the reason he arrested plaintiff was that he felt sure a felony had been committed; that he had seen the tire tracks leading to plaintiff's place down the lane which had not been used by any other vehicle; that there was no doubt in his mind that those tire tracks were made by plaintiff's truck; that at that time it was very rare for a vehicle to have four new tires on it; and when he observed plaintiff's barn lot, it had no wire around it and new fence posts had been set, and plaintiff told him that he intended setting a fence but did not have his wire yet, which seemed strange to the witness; that when he asked plaintiff if he had had his truck west of the house plaintiff first said that he had not, but later said that he had been up there for a short distance, and the witness thought that plaintiff had changed his statements, which made him suspicious of plaintiff.

The witness further testified that he was certain that there had been no backing up and turning around at the place described by plaintiff, where he had gone to see his cattle, and felt certain of that notwithstanding that other witnesses had testified to seeing such

tracks, because the other witnesses had examined the place a day or so later; that the reason he arrested plaintiff at the time was "I wanted him so he couldn't go get this wire and dispose of it, if he had been the party who took it." He stated the reason he contacted Leigh at the time he went out to arrest plaintiff was that he usually worked with the local officers and he thought Leigh could help him in making his investigation; that Leigh was present at the time the witness told plaintiff he was under arrest and heard the whole thing; but he did not help in making the arrest—"There wasn't any helping to do. He was along with me all the time." Plaintiff was put in jail at the witness' suggestion and he (Herron) pushed plaintiff into the jail when he said he wouldn't go in, but he never got rough with plaintiff and did not threaten him in any way.

Defendant, James P. Leigh, the deputy sheriff, testified that officer Herron came to Edina and told the witness that he wanted the witness to go with him to plaintiff's home, which the witness did. His testimony as to the occurrences surrounding the arrest was substantially the same as the testimony of officer Herron. On cross-examination he testified that he went with Herron "as Deputy Sheriff."

State Highway Patrolman Snyder testified that he went with officer Herron to the Rector farm on June 1st and viewed the tire tracks leading from that farm; that the tracks were very vivid and were distinguishable from the tire marks of the other cars that had traveled on the road; that the tracks led south two or two and one-half miles, where it was apparent that the vehicle had turned around in the road and started back and gone down a lane. They could see the tracks in this lane, the "exact track of the car, or very similar to it, I would say the exact track of the tires that we had seen in that barn yard;" that they stopped at the place where plaintiff stated he had turned around and there were no tracks there; that they followed the tracks until they again came to the main road, at which point the tracks were lost; that they proceeded easterly to a farm home and again picked up the tracks going into the farm home, which was plaintiff's home. The witness had had particular training in tracking tire marks and in his opinion the tire marks found at the Rector farm were the same as the tire marks found at plaintiff's home; that they looked very much like U. S. Royal. "They had the long oval shape, that are connected with small beads of rubber, but these are not exactly on the U. S. Royal, they are more or less even, but these were staggered, and I, myself, looked at the tires and I noticed Pennsylvania tires, the ones I looked at on the truck."

At the conclusion of all of the evidence, the cause was submitted to the jury on five instructions for plaintiff (aside from instructions on forms of verdict.) Instruction No. P1 directed a verdict against Leigh if the jury found that said defendant arrested or aided, as-

sisted or countenanced the arrest of plaintiff without warrant and without reasonable grounds to suspect that plaintiff was guilty, and further directed a verdict against defendants Eversole and the Fidelity and Casualty Company if the jury found that defendant Leigh was then and there acting in his capacity as deputy sheriff.

Instruction No. P2 directed a verdict against Herron if said defendant without warrant and without reasonable ground to suspect plaintiff arrested plaintiff.

Instruction No. P3 defined the word "maliciously" as used in said instructions. Instruction No. P4 advised the jury that defendant Leigh's connection with the arrest could be established by circumstantial evidence, and Instruction No. P5 was on the measure of damages.

The instructions given for the defendant (not numbered) advised the jury that officer Herron had a right to arrest without a warrant if he had reasonable grounds to believe that a felony had been committed and to suspect that plaintiff had committed the felony, and that if the jury found for defendant, Herron, then their verdict must be for the other defendants.

As stated, the jury brought in a verdict for $3,000 against defendants Herron, Leigh, Eversole and The Fidelity and Casualty Company, upon which judgment was rendered. Defendants filed a timely motion for a new trial, which was overruled, and defendants duly appealed.

Defendants' main contention is that the trial court erred in refusing to sustain the several motions for a directed verdict offered by the defendants because, under the evidence, patrolman Herron had reasonable grounds to suspect that plaintiff was guilty of a felony at the time he arrested him. If no case was made against defendant Herron it is apparent that no case was made against any of the defendants. The parties are in accord upon the legal proposition that defendant Herron had a right to arrest plaintiff without a warrant only in case he had reasonable cause to suspect that plaintiff had committed a felony.

In passing upon the question of whether plaintiff made a case for the jury we, of course, must give plaintiff the benefit of every inference that the jury could reasonably have drawn from the evidence and must view the evidence in the most favorable light to plaintiff and the evidence adduced by defendants must be treated as untrue except insofar as it tends to aid plaintiff's case. It must also be kept in mind that "the court should never withdraw a question from the jury, unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' " (Parrent v. Mobile & O. R. Co., 70 S. W. (2nd) 1068, 1073 (Mo. Sup.); Kick v. Franklin, 117 S. W. (2nd) 284, 1. c. 287.) (Mo. Sup.)

1168

The chief reason defendants say Herron had reasonable cause to arrest plaintiff is that Herron stated that he tracked plaintiff's truck from the point of the theft to plaintiff's home. It is to be kept in mind that this was a distance of at least four and one-half miles and over a network of roads where other cars had admittedly traveled. Also, that while the tracks were described as being "similar" to those made by U. S. Royal tires, the tires on plaintiff's truck were shown to be those labeled Pennsylvania and Goodrich. On cross-examination Herron admitted that there were breaks of 50, 75 or 100 feet at intervals in the road where the tracks did not show, and that at times he would lose the track for a few feet, but he did not estimate how far. He admitted that on the next morning when plaintiff was arrested he drove a quarter of a mile beyond plaintiff's place, stopped at the home of a neighbor and inquired where plaintiff lived. He was asked: "But you are admitting to this jury that after all this tire investigation and you seen the tracks lead in, that you did drive on up the road and ask some neighbors where Parrish lived? A. That's right. * * * Q. Can you tell us why you drove on up there and asked where Parrish lived if you saw tracks leading there? A. I can't remember now why I did it. No. Sir, I can't tell you." It appears that plaintiff's house was large, located some distance from the road and with many trees around it. Herron admitted "It's the kind of a place as you approach that if you approach to it once a man wouldn't be likely to forget it, would they? A. I wouldn't think so." From these answers a reasonable inference can be drawn that Herron was never at plaintiff's home until the evening of the arrest. When Herron and Leigh came to plaintiff's home he denied all connection with the theft, denied that he or his truck had been up to the place of the theft. In fact, he stated to them that he had not been within three miles of it. He informed them that he had been up the road in the truck to look after his cows in a pasture, but that this was only a mile and a half from his home, and if there were any tracks beyond the pasture "they wasn't mine." He told them that he had turned around in the road near the cow pasture. Whether he was telling the truth could have been easily ascertained by Herron and Leigh if they had seen fit to investigate. This is shown by the testimony of plaintiff's neighbors who examined the road the next day and had no difficulty in locating the place where plaintiff's truck had been turned around in the road.

It was shown that plaintiff had lived his entire life in that community, owned the farm upon which he lived with his wife and infant son and bore an excellent reputation. Yet Herron admitted that before arresting plaintiff he made "no effort whatever to inquire as to the probability of this man committing an offense like that." On the other hand, plaintiff said: "I asked them to go and ask any one they wanted to about me, my character." They refused plain-

tiff's urgent entreaty. They searched plaintiff's premises thoroughly and found no trace of the stolen articles. These consisted of six rolls of heavy 32 inch woven wire and seven spools of barbed wire. Each spool contained wire 80 rods in length and could have easily been discovered had they been on plaintiff's premises. The fact that they were not there when considered with Herron's testimony that "it didn't look like the vehicle had ever stopped" prior to plaintiff's home, so that any unloading of the articles could not have occurred elsewhere, should have allayed the suspicions of any ordinarily prudent man.

The general rule is found in 25 C. J. 550, Section 159, as follows: "The question of whether there is reasonable cause for suspecting that plaintiff had committed a felony or was about to commit one is for the jury, except when the facts are undisputed." In the case at bar the facts are not undisputed.

The cases cited by defendants differ on their facts from this case. Illustrating this we refer briefly to the case of State v. Raines, 98 S. W. (2nd) 580, Mo. Sup. upon which they mainly rely. In that case some person broke into and entered a laundry and stole some shirts. Within a few feet of the laundry was a building used as a funeral home in which defendant had been sleeping. On the morning following the burglary it was discovered that the burglar, in making his exit through a window, had stepped into a sack of soap powder, some of which had evidently adhered to his shoes, causing him to leave visible tracks outside. The tracks led to the back entrance of the funeral home. Before arresting the defendant the sheriff was informed by two men that each had seen the defendant in possession of the property that had been stolen from the laundry. These facts, together with the circumstance that tracks had been found leading from the broken window of the laundry to the door of the funeral home where defendant had slept, led the court to rule: "All the circumstances considered, we think the sheriff had reasonable grounds to believe, or, as many of the cases say, to suspect, that defendant had committed the felony and was justified in arresting him." We think the converse of that holding would apply to the facts in the case at bar.

In their brief defendants quote from 6 C. J. S. pp. 596-597 as follows:

"Where an officer, in good faith, believes that a person is guilty of a felony, and his belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise, he has such probable cause for his belief as will justify him in arresting without a warrant. It has been said that the substance of all definitions of probable cause is a reasonable belief in the guilt of the person arrested. Although the knowledge on which the officer acts, when making an arrest without a warrant, need not

be absolute, yet he is bound not to act arbitrarily, but must exercise his discretion in a legal manner, using all reasonable means to avoid a mistake.''

Under the facts, as disclosed in this record, we cannot say, as a matter of law, that defendant, Herron, used ''all reasonable means to avoid a mistake.'' On the other hand, we agree with the experienced trial judge that the question of whether patrolman Herron had reasonable grounds to suspect that plaintiff has committed a felony was one for the jury to determine.

Appellants' second contention is that a verdict should have been directed for defendants, Leigh, Eversole and the Casualty Company, because the evidence fails to show that defendant Leigh participated in making the arrest. This court stated in Hines v. Fireman's Fund Ins. Co., et al., 235 S. W. 174, l. c. 176: ''It is well established that all persons who directly procure, aid, abet, or assist in an unlawful imprisonment are liable as principals.'' The evidence shows that the defendant, Leigh, was present with defendant, Herron, during all the time that the plaintiff was being questioned, taken into custody, driven to jail, finger-printed and placed in jail; that when defendant, Herron, climbed into the hayloft to search Leigh remained below guarding the plaintiff and, when plaintiff was taken to jail, Leigh had the key and unlocked the door and, after Herron shoved plaintiff in, locked the door. Obviously, under this evidence, this contention is without merit.

Complaint is next made that plaintiff's Instruction P1 was prejudicially erroneous against the defendants, Leigh, Eversole and the Casualty Company because ''this instruction submitted in the alternative (1) that Leigh actually made the arrest or (2) that he 'aided, assisted or countenanced' the arrest when there was no evidence to support the first alternative and the second alternative was not pleaded in the petition.''

From what we have said there was evidence to support the first alternative in that Leigh was present, aiding and assisting Herron in making the arrest. This, under the authorities, made him a joint tort feasor and liable as a principal. (Hines v. Fireman's Fund Ins. Co., et al., supra; 25 C. J. pp. 497-499, Sections 69, 70, 72.)

The other contention that the instruction was erroneous because it was not pleaded in the petition that Leigh ''aided, assisted or countenanced'' the arrest, is answered by the holding in the case of Burke v. Robinson, 271 S. W. 1005, (Mo. App.). In the case at bar the petition alleged that the defendants Herron and Leigh ''did arrest plaintiff.'' In the Burke case the petition alleged that the defendant caused plaintiff to be arrested without warrant of law and imprisoned in jail. The court, at plaintiff's request, gave the following instruction:

''The court further instructs the jury that, while the burden of proof rests upon the plaintiff, the burden of the law does not require

that he should prove by direct testimony that the defendant was heard to give a direct order to arrest the plaintiff, but, if the jury believed from the facts and circumstances in evidence that the defendant encouraged, countenanced, or approved the arrest and imprisonment, and that such arrest and imprisonment was without warrant and wrongful, then the jury should find for the plaintiff and against the defendant.''

The defendant in that case contended that said instruction was erroneous for the reason that it was broader than the pleadings. The court in answer to that contention said: ''The law is well laid down that any person who is present at the commission of a trespass, encouraging or exciting the same words, gestures, looks, or signs, or · who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as a principal (citing cases.) * * * The said allegation of the petition is broad enough for the introduction of evidence tending to show that the defendant countenanced, encouraged and approved the arrest, and the evidence did so tend to show.''

The last complaint relative to this instruction is that in using the word ''countenanced'' it ''improperly allowed the jury to return a verdict on a finding that defendant Leigh took no affirmative part in the arrest, but merely failed to protest the same.''

· Defendants in their brief concede that in cases considering the action of false imprisonment the courts have frequently used language to the effect that a party is liable for false arrest if he ''directed, advised, countenanced, encouraged or instigated'' the arrest. They contend here that the word '' 'countenanced' as used in the decisions means something more than a passive acquiescence.'' If defendants· felt that it was a word of technical meaning it was their duty to have offered an instruction ·defining it and, in the absence of so doing, they cannot complain. (Greaves v. K. C. Jr. Orpheum, et al., 229 Mo. App. 80 S. W. (2d) 228, l. c. 237.)

In our opinion this case was properly tried, the verdict was ·for the right party, and the judgment should be affirmed. It is so ordered. All concur.